IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 4, 2008

Charles R. Fulbruge III
Clerk

No. 06-20401

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

FELICIANO YANEZ SOSA,

Defendant - Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The defendant-appellant Feliciano Yanez Sosa appeals his judgment of conviction and sentence for possession of one or more firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Sosa raises two issues on appeal. First, Sosa argues that the district court abused its discretion in admitting as lay opinion testimony the opinions of various law enforcement officers on matters related to firearms possession and drug trafficking. Second, Sosa argues that the district court abused its discretion in refusing his requested jury instruction on the definition of the "in furtherance" element of the crime of possessing a firearm in furtherance of a drug trafficking offense. For the following reasons, we AFFIRM.

I

The events leading to Sosa's eventual arrest began with law enforcement officers from the Houston Police Department's narcotics team conducting surveillance on a red Mercury Cougar based on a tip that the vehicle was transporting illegal drugs. The Cougar was registered to Sosa. The officers observed the driver of the Cougar conduct what appeared to be two drug deals at two separate locations in the Houston area. After that, the officers followed the Cougar to an apartment complex where they watched the driver enter and leave an apartment and then drive off again. Most of the officers continued to follow the Cougar; one officer remained behind to watch the apartment.

The officers stopped the Cougar for a traffic violation and then arrested the driver, Porfirio Galliardo, when they discovered that he did not have a driver's license. A search of the vehicle revealed approximately sixty grams of cocaine and $1,149 in currency. One of the officers testified, based on his past experience purchasing drugs undercover, that the street value of the cocaine was about $100 per gram, such that the total value of the cocaine found in the car was about $6,000.

During the traffic stop, the officer who remained behind at the apartment complex called the rest of the narcotics team to inform them that a white Lincoln Navigator had arrived at the complex and that two occupants, a man (later identified as Sosa) and a woman, entered the apartment where the driver of the Cougar had been seen earlier.

The officers returned to the apartment. At the door, the officers spoke with one of the occupants of the apartment, Israel Zuazo. Through the doorway, the officers saw Sosa and another male sitting on the sofa in the living room. Zuazo signed a written consent for the officers to search the apartment.

Interviewing Zuazo, the officers learned that Zuazo slept on the couch in the living room and that Sosa occupied the west bedroom of the apartment.

After obtaining Sosa's consent, the officers searched the apartment and found approximately 95.3 grams of powder cocaine and 2.3 grams of crack cocaine behind the drywall in the linen closet of the west bedroom, packaged in "small tiny baggies," which one officer testified was indicative of packaging for individual sales. The estimated street value of the drugs found in the west bedroom was $10,000. The officers also found a loaded .357 caliber revolver in the night stand by the bed in the west bedroom and an unloaded pistol-grip shotgun in the clothes closet. The officers discovered additional cocaine in the east bedroom and in the Navigator. The officers found cans of acetone and lactose as well, chemicals which several officers testified—over objection—are used in manufacturing cocaine. Also, the officers found scales and some notebooks containing amounts of money and recipes for "cutting" or "stretching" cocaine. One officer described the notebooks as "ledgers," used for tracking the financial details of drug transactions. A search of Sosa revealed about $1,400 cash.

Sosa was subsequently charged in a four-count indictment with unlawful possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) (count one); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (count two); possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (count three); and possession of one or more firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (count four). Sosa's case was tried to a jury. He stipulated at trial to all of the elements necessary to convict him on the first three counts. After a two-day trial, the jury found Sosa guilty of counts one, two, and three. However, on the parties' consent, the district court declared a mistrial as to count four after the jury informed the

court that they were deadlocked eleven-to-one on that count and unable to reach a verdict.

The case was retried about a month later. Prior to the second trial, reacting to testimony elicited by the Government in the first trial, Sosa filed a motion in limine asking the district court to exclude expert testimony for which the Government had failed to provide disclosures under Rule 16 of the Federal Rules of Criminal Procedure regarding: (1) how a narcotic is manufactured or the inner workings of a narcotics distribution network; (2) the nature, uses, construction or modification of the firearms at Sosa's residence; and (3) the reasons a person found with narcotics may also possess firearms. The district court denied the motion.

During trial, over Sosa's objections, the Government elicited testimony on each of these matters. First, Officer Veliz, a ten-year veteran of the Houston Police Department's Narcotics Division, testified about the use in drug manufacturing of acetone, a chemical found in Sosa's apartment. Officer Veliz stated:

> In narcotics trafficking, those substances are used when a person would purchase a bulk amount of powder cocaine. However much that amount would be, they would be stretched and these would be the chemicals that would be used to stretch out the amount of the cocaine in order to make more money.

Officer Veliz also testified that he had seen firearms located near drugs in prior investigations on "many" occasions and that, based on his experience, it was common to find firearms in close proximity to drugs because "[w]eapons are used to defend whatever it is that you feel is valuable to you. You're going to have weapons to defend yourself from other people with the drugs that are in there, in order to defend your product."

Next to testify was Agent Saltarelli, a Special Agent of the Bureau of Immigration and Customs Enforcement ("ICE") and member since 2000 of the

joint-task force Targeted Narcotics Enforcement Team. Agent Saltarelli testified that in his personal experience it was common to find both guns and drugs together in the same place, noting that "[i]t's kind of a dangerous business." He also stated that he was not surprised to find the drugs and guns in such close proximity.

Third, Officer Reeves testified. Officer Reeves was a twenty-year veteran of the Houston Police Department with four years of experience as a narcotics officer. He described the shotgun found in Sosa's closet:

> It is a pistol grip, which is often modified. Normally it would come with a long stock. The pistol grip is for close quarters, where you can hold the gun to your side. You're not going to be bringing it up to your shoulder as if in a hunting stance, and you're not concerned about taking a long shot. You're doing a short shot. So, if you're pointing in the general area, you're going to hit.

Officer Reeves testified that the pistol grip on the shotgun made it easier to conceal because the shotgun was shorter. He also stated that he had seen firearms in close proximity to drugs "[m]any, many times." When asked why, he testified: "One just coincides with the other. Either there is violence involved and there is fear of being robbed or occasionally drug dealers rob other drug dealers. Where you find drugs, you're going to find weapons."

Officer Reeves also testified about the role of chemicals found in Sosa's apartment, specifically lactose and acetone, in drug manufacturing. He explained:

> Well, you have your cocaine and when you purchase it, it's at a purity where you can take lactose or there is other products that you can get at stores like lactose, and you take the acetone, you mix the initial cocaine with the lactose and the acetone, you make it into a mud or paste in a pot or bowl, and then after you are done with that, you place it into a mold, whatever you want to shape it into.
> It's just like when you are filling up your car, you spill gasoline on the ground, the acetone does the same thing, it will eventually just evaporate. And as the acetone evaporates out of the cocaine and the paste that you have made, it will again form into a chalky kind of

hard substance if you can press it also, and some will press it back into the brick form. And as they break it off and they make sales, it looks chunkier and it makes the product look like it's more pure because it looks chunkier and not just so powdery.

With respect to acetone, Officer Reeves explained:

Just like I said, it's used to break down the cocaine. It's often found in women's fingernail cleaner. If you ever had your wife sit and clean her fingernails, the strong pungent odor when she's using the cotton balls to clean the nails, the polish off of her nails, that's what acetone is. You'll find acetone in nail polish remover. And you will either find the acetone in this form or many times I'll find large bottles of fingernail polish remover. They will use that also.

The district court denied Sosa's requested instruction on the "in furtherance" element of the crime for which he was charged, possessing a firearm in furtherance of a drug trafficking offense. The jury found Sosa guilty of count four as alleged in the indictment. The district court sentenced Sosa to fifty-one months imprisonment on counts one, two, and three to run concurrently and sentenced Sosa to a consecutive sixty-month term on count four. Sosa timely appealed.

II

Sosa claims that the district court committed reversible error by admitting the testimony of law enforcement officers on (1) the use of chemicals found in Sosa's apartment to manufacture narcotics; (2) the modification of the shotgun in Sosa's closet; and (3) the prevalence of firearms in proximity to drugs and the reasons why firearms are often found near drugs. The district court admitted the officers' testimony on these topics as lay opinion testimony. Sosa argues that the officers' testimony was inadmissible as lay opinion because it was based on "specialized knowledge."

We review a district court's evidentiary rulings for abuse of discretion. See United States v. Griffin, 324 F.3d 330, 347 (5th Cir. 2003); United States v.

Mendoza-Medina, 346 F.3d 121, 127 (5th Cir. 2003). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." United States v. Ragsdale, 426 F.3d 765, 774 (5th Cir. 2005) (quoting Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 584 (5th Cir. 2003)). Moreover, our review of evidentiary rulings in criminal trials is heightened. Mendoza-Medina, 346 F.3d at 127; United States v. Anderson, 933 F.2d 1261, 1268 (5th Cir. 1991).[1]

Federal Rule of Evidence 701 governs the admissibility of opinion testimony by lay witnesses. Rule 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

(emphasis added). "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" FED. R. EVID. 701, Advisory Committee Notes to 2000 Amendments (quoting State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992)). As explained by the Second Circuit, "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005). Moreover, any

---

[1] The Government points to a number of instances of testimony regarding these (or similar) matters to which Sosa did not object and argues that the court should review the admission of such testimony for plain error only. The defendant argues that the "definitive" ruling on his pretrial motion in limine was sufficient to preserve an objection to all such testimony and that the court should therefore review all testimony on these matters for harmless error. See FED. R. EVID. 103(a); Mathis v. Exxon Corp., 302 F.3d 448, 459 n.16 (5th Cir. 2002). We do not resolve this issue because even assuming for the sake of argument that the harmless error doctrine applies, the defendant's claim nonetheless fails.

part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701. Id. (citing FED. R. EVID. 701, Advisory Committee Notes to 2000 Amendments).

The district court allowed law enforcement officials to provide lay testimony on these subjects—the use of chemicals in drug manufacturing, modifications to firearms, and the reason why drug dealers carry guns—under Rule 701, reasoning that testimony on these matters was not based on specialized knowledge within the scope of Rule 702, but rather upon the witnesses' personal knowledge. For much of the disputed testimony, we doubt that the district court abused its discretion in determining that the particular testimony at issue fell within the bounds of permissible lay opinion testimony and thus did not impinge the territory of specialized knowledge. For example, with respect to Officer Reeves's testimony about the modifications made to the shotgun, we doubt that this testimony exceeded the bounds of permissible lay opinion testimony. Most of the testimony was merely descriptive. It is not clear that the testimony that went beyond description, into the realm of opinion, was based on "specialized knowledge" as opposed simply to common sense or the officer's past experience formed from firsthand observation. Yet, with respect to at least some of the testimony, specifically the detailed testimony of Officer Reeves regarding the use of the chemicals found in Sosa's apartment, the district court may have erred in admitting this testimony as lay opinion.

However, we need not conclusively resolve this issue because, even assuming for the sake of argument that the evidence should have been excluded, any error in admitting this testimony was harmless.[2] An abuse of discretion in admitting or excluding evidence is subject to harmless error review. Ragsdale,

---

[2] For this same reason, we also do not address Sosa's other argument that the admission of this testimony was in error because it constituted impermissible profiling evidence.

426 F.3d at 774–75; Mendoza-Medina, 346 F.3d at 127. Under the harmless error doctrine, even if the district court abuses its discretion in admitting or excluding evidence, we will affirm "[u]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." Mendoza-Medina, 346 F.3d at 127; see also FED R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

Apart from the disputed testimony, the evidence against Sosa in this case was substantial. The evidence introduced at trial was more than sufficient to establish the relevant factors supporting a finding that Sosa possessed the firearm in furtherance of a drug trafficking offense. Whether a defendant possessed a gun to help further, advance, or forward a drug trafficking offense requires a consideration of several factors, including

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

United States v. Ceballos-Torres, 218 F.3d 409, 414–15 (5th Cir. 2000). In this case, the evidence introduced at trial established (1) that Sosa was engaged in significant drug activity based, for example, on the amount and value of the drugs and cash found in his apartment and car, (2) that the two firearms were easily accessible, located in the night stand and clothes closet in his bedroom, (3) that Sosa possessed the firearms illegally (as an illegal alien), (4) that one of the guns, the .357 revolver was fully loaded, (5) that the guns were located near the bulk of the drugs that were recovered, in Sosa's bedroom, and (6) that other than the cocaine and its cash proceeds, there were no other valuables in the apartment. Based on these factors, the Government presented a strong case that Sosa's possession of the firearms was in furtherance of a drug trafficking

9

crime. Cf. Ceballos-Torres, 218 F.3d at 415 ("[T]he evidence before us supports a conclusion that [the defendant's] possession of the Glock was 'in furtherance' of his drug trafficking offense. The weapon was loaded and easily accessible in [the defendant's] apartment, and he confessed to ownership of the firearm. It was possessed illegally. And it was possessed in the apartment along with a substantial amount of drugs and money.").

In light of the substantial evidence against Sosa, we cannot conclude that there is a reasonable possibility that the disputed testimony contributed to Sosa's conviction. First, the testimony that certain chemicals found in Sosa's apartment were used in manufacturing cocaine was harmless error. This testimony was relevant to the question of whether Sosa was engaged in drug trafficking. However, the evidence that Sosa was engaged in drug trafficking was strong and included the substantial amount and value of drugs found in Sosa's bedroom and vehicle, the notebooks the officers found, the scales, and the individualized packaging of the cocaine. The officers' testimony about the use of the chemicals in Sosa's apartment in manufacturing cocaine was simply a small portion of an otherwise strong showing that Sosa was engaged in drug trafficking and thus its admission was harmless error.[3]

Second, we question whether the testimony about the shotgun found in Sosa's closet was admitted in error at all, but even assuming it was, that admission also was harmless error. Most of the testimony simply described the shotgun. The testimony that went beyond description, to discuss the modifications made to the shotgun—and which, again, we doubt was "specialized knowledge" at all—did not undercut Sosa's defense that the weapon was for personal protection. Although the testimony may have undercut a possible

---

[3] At Sosa's first trial, Sosa stipulated to all of the facts necessary to sustain a conviction on the charges against him for possession with intent to distribute. However, it is not clear from the record that a similar stipulation was entered by the parties during the second trial.

defense that the shotgun was used for hunting, Sosa did not raise or suggest a hunting defense at trial. Further, the officer explained that the shotgun was easier to conceal because it was shorter. However, even without this testimony, the jury could observe the weapon and determine for itself whether the shotgun was capable of concealment. In any event, again, the testimony about the shotgun was only a small portion of a strong case against the defendant and thus its admission was harmless error.

Finally, Sosa complains about the admission of the testimony that—in substance—drugs and guns are commonly found together and that drug dealers use guns to protect their business because of the inherent violence of the trade. This testimony was relevant to the issue of why Sosa possessed the gun, in other words, whether his possession was "in furtherance" of a drug trafficking crime. In Ceballos-Torres we emphasized that establishing that a defendant possessed a firearm in furtherance of a drug trafficking crime required evidence "more specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense." 218 F.3d at 414. The critical question, therefore, is whether a particular defendant possessed the firearm in furtherance of the drug trafficking offense, not whether drug dealers "generally use guns to protect themselves and their drugs." Id.

The district court in this case properly instructed the jury that it was to find whether the Government proved beyond a reasonable doubt that "the Defendant" knowingly possessed a firearm in furtherance of a drug trafficking crime and that "to prove that the defendant possessed a firearm in furtherance, the government must prove that the defendant possessed a firearm that furthers, advances, or helps forward the drug trafficking crime" (emphasis added). In addition, in closing, the prosecutor argued that Sosa personally possessed the guns to protect his stash of drugs, made minimal (if any) use of the more generalized argument identified in Ceballos-Torres, and did not expressly invoke

any of the officers' disputed testimony on this general point as authority for the proposition that Sosa possessed the guns in furtherance of a drug trafficking crime. Instead, the prosecutor argued that the particular circumstances of this case warranted a finding that Sosa possessed the firearms in furtherance of drug trafficking. Under these circumstances, we find that the admission of this testimony was, if anything, harmless error.

We therefore find no reversible error in the district court's admission of the testimony of these law enforcement officials as lay opinion testimony.[4]

## III

Sosa next argues that the district court abused its discretion by refusing his requested jury instruction on possession of a firearm "in furtherance" of a drug trafficking offense.

We review the district court's refusal to give a defense-tendered instruction for abuse of discretion. United States v. John, 309 F.3d 298, 304 (5th Cir. 2002). A district court's rejection of a requested jury instruction constitutes an abuse of discretion and reversible error "only if the requested jury instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." United States v. O'Keefe, 426

---

[4] Based on Sosa's claim that this testimony should have been admitted as expert testimony, or not at all, Sosa also contends that the Government violated the disclosure requirements of Federal Rule of Criminal Procedure 16, which requires the Government to provide pretrial expert reports. Even assuming Sosa were correct, Sosa suffered no prejudice as a result of any such violation. See United States v. Lopez, 271 F.3d 472, 483–84 (3d Cir. 2001) (requiring a showing that any action or inaction taken by the district court under Rule 16 resulted in prejudice). The first trial, which occurred about a month prior to the second trial, disclosed the relevant alleged "expert" testimony introduced against Sosa in the second trial. Under these circumstances, there was no unfair surprise or prejudice resulting from the Government's prior failure to disclose any alleged expert testimony.

F.3d 274, 277 (5th Cir. 2005) (quoting United States v. Richards, 204 F.3d 177, 204 (5th Cir. 2000)).

The crime of possession of a firearm in furtherance of a drug trafficking offense is set out in 18 U.S.C. § 924(c)(1)(A). Section 924(c)(1)(A) punishes "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . ."

The defendant argues that the district court erred in refusing his instruction that the mere presence of a firearm at the scene is not enough to convict. Rather, relying on this court's decision in United States v. Ceballos-Torres, the defendant sought an instruction that "[w]hat is instead required is evidence more specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense." 218 F.3d at 414.

The district court did not abuse its discretion in refusing Sosa's requested instruction on the "in furtherance" element because the district court's charge substantially covered the underlying principle of Sosa's requested charge, that mere possession is not enough. The district court's charge on this element, modeled after the Fifth Circuit pattern jury instructions, provided in relevant part that the Government was required to prove each element of the offense beyond a reasonable doubt and that "to prove that the defendant possessed a firearm in furtherance, the government must prove that the defendant possessed a firearm that furthers, advances, or helps forward the drug trafficking crime" (emphasis added). Continuing, the instruction provided:

> In considering whether the defendant possessed the firearm in furtherance of a drug trafficking crime, that is, to further advance or to help forward the crime, you may consider such factors as the following: The type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, the time and

circumstances under which the gun was and found, and such other factors.

(emphasis added). The district court's instruction thus twice emphasized that the Government was required to prove beyond a reasonable doubt that the defendant's possession actually furthered the drug trafficking offense and was therefore consistent with the holding in Ceballos-Torres that "firearm possession that furthers, advances, or helps forward the drug trafficking offense violates the statute." 218 F.3d at 415. The factors for making this determination, outlined for the jury's consideration, were also consistent with those articulated in Ceballos-Torres. See id. at 414–15.

Because the district court's instructions clearly required that the possession be in actual furtherance of the drug trafficking offense, we conclude that the instruction as a whole substantially covered the principle that mere possession was not enough. The district court's rejection of the defendant's instruction thus did not constitute an abuse of discretion.

Finding no reversible error, we AFFIRM.